## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| KAREN THOMSEN and | ) | |
| KATHRYN McCAULEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-05-1196-F |
| | ) | |
| THE CITY OF ANADARKO, | ) | |
| OKLAHOMA, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the court is Defendant's Motion for Summary Judgment, filed June 1, 2006 (doc. no. 16).   Plaintiffs have responded, and the motion is ready for determination.

Plaintiffs, Karen Thomsen ("Thomsen") and Kathryn McCauley ("McCauley"), allege that they were terminated from their employment with defendant, the City of Anadarko, Oklahoma ("City"), in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634.  The City moves for summary judgment in its favor on the claims of Thomsen and McCauley, arguing that plaintiffs cannot establish a prima facie case of age discrimination for a reduction-in-force case and that plaintiffs have no evidence of pretext.

Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The moving party has the burden of showing the absence of a genuine issue of material fact.  Celotex

Corp. v. Catrett, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996).  Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial.  Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Relevant Facts Applicable to Both Plaintiffs

The following relevant facts are either undisputed or taken in a light most favorable to Thomsen and McCauley.

The City is a charter city with a council-manager form of government.  The city council consists of seven members, including the mayor and vice mayor.  Under the city charter, the city manager, who is appointed and serves at the pleasure of the majority of the city council, is the administrative head of the municipal government. One of the special powers and duties that the charter gives to the city manager is to "appoint and remove at pleasure . . . all heads, subordinates and employees of all departments, such appointments and removals to be made on the basis of merit and fitness alone."  *See*, Exhibit A of defendant's Appendix to Brief of Defendant, City of Anadarko in Support of its Motion for Summary Judgment ("Appendix"), City Charter, Sections 4.1, 4.2, 5.2 and 5.4.  The charter also provides that "[t]he city manager shall appoint a city clerk of the city of Anadarko, who shall hold office at the pleasure of the city manager" and that "[t]he city council shall appoint a city treasurer,

who shall hold office at the pleasure of the city council." *See*, *Id.*; Sections 5.7 and 5.10.

The four most recent city managers for the City have been Alan Riffle ("Riffle") (March of 1996 until August 10, 2003), Beverly Wilhoite ("Wilhoite") (August 11, 2003 until March 23, 2004), Roy Rainey ("Rainey") (March 24, 2004 until December 17, 2004) and Robert Williamson ("Williamson") (December 20, 2004 to present). *See*, Exhibit D of defendant's Appendix, Thomsen's deposition, p. 27, ll. 24-25; p. 29, ll. 5-8; Exhibit E of defendant's Appendix, December 17, 2004 minutes.

The Anadarko Public Works Authority ("APWA") is a public trust formed under 60 O.S. § 176, *et seq.*, with the City as its beneficiary.  Through the APWA, the City purchases wholesale electricity from Western Farmers Electric Coop. ("WFEC"), which it then sells to its citizens.  *See*, Exhibit B of defendant's Appendix, Special Audit by the Office of the State Auditor and Inspector for June 1, 2000 - June 30, 2005 ("Special Audit"), p. 7; Exhibit C of defendant's Appendix, Williamson's deposition, p. 20, ll. 5-13.

During the last several years of Riffle's tenure as city manager and Wilhoite's tenure as interim city manager, the City had engaged in deficit spending.  In addition, according to the Special Audit, the City had (1) made agreements for repayment of debts without council/AWPA board approval; (2) voided checks subsequent to council/APWA board approval for payment; (3) made questionable and unapproved payments to Riffle; and (4) entered into improper multi-year financial agreements. Further, from January 26, 2001, until Riffle's departure on August 11, 2003, the City had incurred indebtedness to WFEC amounting to $642,980.70.  *See*, Exhibit D of defendant's Appendix, Thomsen's deposition, p. 36, ll. 7-13; Exhibit B of defendant's Appendix, Special Audit, p. 22, 30, 41, 42, 43, 45-49 & Attachment B.

When Rainey assumed the city manager position in March of 2004, the City's debt to WFEC was $480,236.17.  At a special meeting of the city council on July 27, 2004, Rainey presented a financial plan and facts.  The facts presented were: (1) the City was behind three months in payments to WFEC; (2) the current "peak demand" electric charge barely covers the City's operating expenditures and it will produce little if any surplus to carry through the remainder of the fiscal year; (3) the wastewater treatment plant operated at a deficit of nearly $300,000 last year; (4) revenues have not been increased since before 1992 except for an increase in sewer charge; and (5) the City is presently under a consent order from ODEQ to upgrade its wastewater treatment plant at a cost of $3,500,000, which the voters had approved. *See*, Exhibit B of defendant's Appendix, Attachment B to Special Audit; Exhibit E of defendant's Appendix, July 27, 2004 minutes.

At its regular meeting held August 5, 2004, the city council adopted Ordinance No. 1164 amending the utility rates.  *See*, Supplemental Exhibit E of defendant's Appendix, filed August 9, 2006 (doc. no. 31).

At the special meeting held August 24, 2004, the city council authorized the city manager to arrange for an operating line of credit for APWA in the amount of $1,000,000 to be secured by the unobligated sales tax revenue of the City.  *See*, Exhibit E of defendant's Appendix, August 24, 2004 minutes.

Due to some of the public revelations regarding the City's finances, citizens began to question the competence of the City's leaders.  Vonda Neal, a former city clerk, co-founded a group of Anadarko citizens called "Concerned Citizens for Government" ("CCG") to address their concerns, which included the City's failure to make payments to WFEC and the City's decision to increase utility rates.  Neal informed Williamson, her employer, of the CCG's concerns.  Williamson was a former city manager and mayor.  He attended a few city council meetings and also

attended a few of CCG's meetings. At its meetings, the CCG discussed the recall of council members. *See*, Exhibit C of defendant's Appendix, Williamson's deposition, p. 6, ll. 22-25; p. 7, ll. 1-5; p. 16, ll. 21-25; p. 17, ll. 1-15; p. 18, ll. 17-24; p. 22, ll. 21-25; p. 23, ll. 1-18; p. 24, ll. 6-9, 10-19; Exhibit D of defendant's Appendix, Thomsen's deposition, p. 35, ll. 5-11; p. 36, ll. 5-6; Exhibit F of defendant's Appendix, Pickens' deposition, p. 13, ll. 7-23.

Robert Brooks, the City's director of finance, resigned his position effective September 3, 2004. At its regular meeting on September 13, 2004, the city council approved the engagement of the firm of Minnix & Meacham to handle the City's finances. At that meeting, Rainey reported that he had notified all department heads that there was a spending and hiring freeze. *See*, Exhibit E of defendant's Appendix, August 24, 2004 and September 13, 2004 minutes.

In his city manager's report for September of 2004, Rainey disclosed that: (1) the City employees' health insurance had been suspended for failure to make a timely premium payment; (2) cutting two checks to pay for insurance premiums overdrew the pooled cash account by $80,000 and led to the discovery that the account had been used as a "slush fund" to indiscriminately pay obligations as they came due with whatever cash remained available in the account from whatever source; Rainey had no idea what funds should be reserved in the account from several sales taxes, gasoline tax, utility revenues or other restricted and unrestricted revenues and would have to completely reconstruct the account to determine obligations for every manner of purchase or payment; (4) the restricted fund into which the hotel/motel bed tax revenues were formerly deposited was no longer being used and the tax monies were deposited into the pooled cash account and losing their identity for accounting and payment purposes; (5) Russ Meacham ("Meacham") of the firm of Minnix & Meacham, was working on financial records; the City was not out of the woods yet

and it was having great difficulty in managing a solution to the problem of payments to WFEC; and (6) he had instructed that all employees who have not completed a probationary period be terminated; had cancelled or suspended all charge accounts and had suspended use of all open purchase orders. *See*, Exhibit K of defendant's Appendix.

In his city manager's report for October of 2004, Rainey disclosed that due to revenue/expense projections that showed a deficiency at the end of the fiscal year, layoffs and furloughs were initiated on October 15, 2004. According to Rainey, this statement referred to the closing of the golf course. *See*, Exhibit L of defendant's Appendix; Exhibit H of defendant's Appendix, Rainey's deposition, p. 65, ll. 16-17.

In the fall of 2004, Rainey believed the City was on the verge of bankruptcy. *See*, Exhibit H of defendant's Appendix, p. 80, ll. 20-25.

On December 1, 2004, Meacham and Rainey presented a 200-page proposed budget for 2005. Meacham reported to city council that: (1) 80% of the City budget was for personnel costs; (2) the City was top-heavy on staff; (3) there was no cash available to pay debt to WFEC and three payrolls in November, so cash was limited to pay debt; (4) the budget starts with a zero balance, rather than a deficit number; and (5) the repayment of WFEC was shown in the 2005 budget, as well as the utility rate increase. Rainey also reported that 41 percent of personnel cost was for fringe benefits. He further recommended that the City borrow money to pay the WFEC debt in order to avoid the 25 percent penalty the City was paying. *See*, Exhibit E of defendant's Appendix, December 1, 2004 minutes.

Political turmoil resulted from the revelations of the City's financial situation in the summer and fall of 2004. In August of 2004, recall petitions were filed by the CCG calling for a recall of the vice-mayor and three of the city council members. The mayor resigned effective August 25, 2004. By December 17, 2004, only one of the

seven council members seated at the beginning of Rainey's tenure remained in office. As of December 1, 2004, Vonda Neal, co-founder of CCG, was a council member. *See*, Exhibit B of defendant's Appendix, Special Audit, p. 7; Exhibit C of defendant's Appendix, Williamson's deposition, p. 26, ll. 24-25; p. 27, ll. 1-6; Exhibit E of defendant's Appendix, December 1, 2004 and December 17, 2004 minutes; Exhibit F of defendant's Appendix, Pickens' deposition, p. 13, ll. 7-23.

On November 8, 2004, Rainey submitted his resignation as city manager to be effective December 31, 2004. According to Thomsen, Rainey was forced out by the CCG because of the utility rate increase. At a special meeting held on December 17, 2004, city councilman James Hamilton read a letter from Rainey wherein he agreed accelerate his resignation to that very day. Thereafter, the city council appointed Williamson as the new city manager effective December 20, 2004. *See*, Exhibit E of defendant's Appendix, December 17, 2004 minutes; Exhibit D of defendant's Appendix, Thomsen's deposition, p. 35, ll. 3-8; Exhibit H of defendant's Appendix, Rainey's deposition, p. 66, ll. 3-8.

When Rainey left as city manager, he believed the City's financial condition was like "a different world." According to Rainey, "[w]e weren't out of the woods yet from the standpoint of available cash but we certainly had the expectation that that cash was going to be there." He also stated: "I don't know that Anadarko had ever been in that good a shape even though, again, I freely admit that Russ Meacham was telling us almost from [ ]week to week how much we could spend that week in order that we not get ourselves back in the pit that we had just come out of." Exhibit 1 of plaintiffs' Objection and Response to Defendant's Motion for Summary Judgment ("Response"), Rainey's deposition, p. 34, ll. 5-14.

Williamson admitted that if Rainey had not instituted a utility rate increase, the City would have been bankrupt. At its regular meeting held March 14, 2005, the city

council approved a loan from Anadarko Bank & Trust to pay off the debt to WFEC. Such a loan had been suggested by Rainey during discussion of the 2005 budget.  *See*, Exhibit C of defendant's Appendix, p. 22, ll. 13-20; Exhibit 14 of plaintiffs' Response; Exhibit E of defendant's Appendix, December 1, 2004 minutes.

In February of 2005, Mildred Weber, an 83-year-old employee assigned to the City of Anadarko Housing Authority, was terminated by Williamson and personnel director, Katy Pickens.  Her pay was a little more than $7.00 per hour.  Exhibit 9 of plaintiffs' Response.

Relevant Facts Applicable to Thomsen

The following relevant facts are undisputed or taken in a light most favorable to Thomsen.

Thomsen was born on October 3, 1942.  She was appointed as city clerk in October of 1994.  She was also appointed to the additional position of city treasurer in late 1997 or early 1998.  Two days after Williamson became city manager, Thomsen married Riffle, the former city manager.  *See*, Exhibit D of defendant's Appendix, Thomsen's deposition, p. 15, ll. 17-18; p. 20, ll. 12-16; p. 24, ll. 20-22; p. 5, ll. 11-14.

The City had adopted a formal pay plan/scale for its employees.  Under the plan, Thomsen's rate of pay of $26.51 per hour equated to the rate of pay for a city clerk with 31 years of service.  Thomsen had a tenure of almost 11 years.  However, according to Rainey, Thomsen's salary was not disproportionate to her duties.  Rainey also had given her a merit increase, at the urging of the city council, because of the extra work she had performed for the City.  *See*, Exhibit D of defendant's Appendix, Thomsen's deposition, p. 37, ll. 11-20; p. 38, ll. 10-17; Exhibit 1 of plaintiffs' Response, Rainey's deposition, p. 38, ll. 4-25.

On January 5, 2005, Williamson, in the presence of the then-city attorney, asked for Thomsen's resignation.  Thomsen testified to the conversation as follows:

> The first thing he said to me was, I want your resignation.  Well, that totally surprised me.  I had no idea.  And I said, no.  I said, I'm getting ready to go for surgery.  I cannot just not have any benefits of any type.  And he said - - well, I don't know at that time - - but he said, honey, he said, you've just priced yourself out of a job.
>
> And I said, Robert, when Bill Rowton brought me in, he brought me in at I think it was step 9 because he wanted a certified municipal clerk, and he wanted me to clean utility billing up and some other areas.  And I said, Robert, I said, can you reclassify me?  I said, I'm willing for you to reclassify me.
>
> He said, well I might.  I said, where would that be?  He said, dog catcher.  I said, that's just what I thought, you - - dog pound?  And he said, no, he said, I can't - - I said, but Robert, I am willing to take reclassification.  I need to get my hands fixed, and then when I am fully recovered and without any restrictions, I will give you my resignation.  And he said no.
>
> I told him - - this may not be in succession, but I told him that I had injury leave, and I had sick leave and what I had taken before was injury leave, I still had 162 days I believe left of that and 500 and some hours of sick leave.  And he said, well, you can just retire.  And he said, we'll just put a little article in the paper saying you want to spend more time with your family.  And I said, Robert, you're making me sound old.  And he said, so?  And that upset me.
>
> And then the conversation - - I said - - Robert said, you would want a good recommendation from me, wouldn't you?  And I said, Robert, I was city clerk of the year for the State of Oklahoma in 2003.  I said, I've sat on a lot of boards and everything.  And he went, woo, like that and made fun of me.  So that really upset me.
>
> And he said, well, you work at my pleasure.  He said, you know what the charter says.  And he said, if you can't write your resignation, I can write one for you.  And I said, I don't need you to write anything for me.  It never got loud.  Nobody yelled at either one.

*See,* Exhibit 2 of plaintiffs' Response, Thomsen's deposition, p. 90, ll. 1-25, p. 91, ll. 1-19.

On January 10, 2005, Thomsen advised Williamson that her doctor had set up her surgery for January 18.  Williamson reported to the city council that night that Thomsen was going to be away from work for a while because she was slated for hand surgery.  *See*, Exhibit 3 of plaintiffs' Response; Interrogatory no. 1 response.

On January 13, 2005, Williamson said to plaintiff that "Tomorrow is your last day, we need to talk."  *See*, Exhibit 3 of plaintiffs' Response, Interrogatory no. 6 response.

On the morning of January 14, 2005, Williamson told Thomsen, "if you will give me your resignation today, I will give you three months pay with benefits." Thomsen replied, "I'll think about it and get back with you."  During her lunch hour, Thomsen prepared a document to effect her resignation with terms including Thomsen maintaining active status under a separate job classification with current pay and benefits for 12 weeks, during which time she would be placed on injury leave or paid leave of absence.   When Thomsen presented the document to Williamson that evening, he stated: "I can't do that."  Katy Pickens ("Pickens"), personnel director, was present at that meeting.  Williamson and Pickens then began discussing other proposals.  The last proposal discussed  was $4000 and 43.5 hours of vacation time Thomsen had coming.  Williamson and Thomsen could not come to any agreement. Williamson thereafter became angry and grabbed a personnel action sheet from Pickens.  He then told Thomsen that she gave him no other options and that he was going to have to terminate her.  *See*,  Exhibit 2 of plaintiffs' Response, Thomsen's deposition, p. 104, ll. 1-25; p. 105, ll. 1-25, p. 106, ll. 1-8; Exhibit C of defendant's Appendix, Williamson's deposition, p. 62, ll. 19-20; p. 63, ll. 12-17; p. 64, ll. 17-23; Exhibit N of defendant's Appendix.

Earlier that morning, Thomsen had asked Pickens if Williamson liked Thomsen. Pickens replied, "uh, no," while shaking her head.   *See*, Exhibit 2 of plaintiffs' Response, Thomsen's deposition, p. 106, ll. 24-25; p. 107, ll. 1-6.

Thomsen was terminated by Williamson effective January 14, 2005.  Although Thomsen had been terminated by Williamson, the charter provided that the city treasurer served at the pleasure of the city council.  At its regular meeting on  March 14, 2005, the city council, at the request of Williamson, terminated Thomsen as city treasurer effective January 27, 2005. *See,* Exhibit O of defendant's Appendix; Exhibit A of defendant's Appendix, Section 5.10; Exhibit 14 of plaintiffs' Response.

Jeanette Johnson, former billing supervisor, who was 45 at the time, was named interim city clerk.  Currently, Tracey Harris, billing supervisor, who is less than forty years of age, performs the city clerk's duties as interim city clerk.  Neal, a council member, was appointed by the city council to perform the duties of city treasurer. *See*, Exhibit C of defendant's Appendix, Williamson's deposition, p.  68, ll. 16-23; p. 69, ll. 1- 15; Exhibit D of defendant's Appendix, Thomsen's deposition, p. 134, ll. 24-25; p. 135, ll. 9–18; p. 138, ll. 6-15; Exhibit 3 of plaintiffs' Response, Interrogatory no. 3 response.

Relevant Facts Applicable to McCauley

The following relevant facts are undisputed or taken in a light most favorable to McCauley.

McCauley was born on May 13, 1941.  In July, 2000, McCauley was hired by Riffle for the position of grants administrator.  McCauley's salary was $17.16 per hour. *See*, Exhibit I of defendant's Appendix, McCauley's deposition, p. 5, ll. 14-15; p. 14, ll. 6-9; p. 16, ll. 4-15.

On July 27, 2004, Rainey terminated Cheryl Weber ("Weber"), who had been employed in the position of accounts payable clerk.  Weber's rate of pay was less than

$13.65 an hour.  Shortly thereafter, Rainey placed McCauley in the accounts payable clerk position on an interim basis.  Rainey then offered McCauley the position permanently, which she accepted.  Rainey eliminated the grants administrator position, previously held by McCauley.  She continued to receive the same salary. McCauley reported directly to Robert Brooks, director of finance, until his resignation effective September 3, 2004.  McCauley reported directly to Meacham, the City's financial consultant, until his departure in December of 2004.  *See*,  Exhibit 3 of plaintiffs' Response, Rainey's deposition, p. 42, ll. 10-19; Exhibit J of Defendant's Appendix, Weber's deposition, p. 7, ll. 17-22, 25; p. 8, ll. 1-7; Exhibit I of defendant's Appendix, McCauley's deposition, p. 59, ll. 2-25; p. 75, ll. 11-13, 20-22; Exhibit 1 of plaintiffs' Response, Rainey's deposition, p. 41, ll. 1-21; Exhibit 5 of plaintiffs' Response, McCauley's deposition, p. 67, ll. 1-6.

Weber appealed her termination by Rainey as authorized under the city charter. The appeal board voted not to reinstate Weber.  Although the charter provides that a city manager has an opportunity to defend his actions before the city council, Williamson, in January of 2005, advised the city council that he felt Weber's termination was wrongful and that she should be reinstated.  The city council thereafter voted to have Williamson reinstate Weber.  Pickens, the personnel director, had questioned Williamson, prior to Weber's reinstatement, as to whether [Weber's reinstatement] was something he wanted to do in light of the personality conflict that had previously existed with some of the co-workers.  *See*, Exhibit A of defendant's Appendix, Section 20.2; Exhibit C of defendant's Appendix, Williamson's deposition, p. 79, ll. 5-12; Exhibit 8 of plaintiffs' Response, Pickens' deposition, p. 27, ll. 14-20.

On January 10, 2005, a day or two before Weber returned to work, Williamson told McCauley that he was going to move her to the position of director of finance. He also told McCauley that Patti Clift, a certified public accountant who had worked

with the City in the past and who had replaced Meacham as financial consultant, was to train McCauley in that position.  *See*, Exhibit 5 of plaintiffs' Response, McCauley's deposition, p. 60, ll. 4-19; p. 61, ll. 6-24; p. 74, ll. 9-25; p. 79, ll. 8-15.

Williamson asked McCauley to train Weber because McCauley had put the accounts payable information on the computer during Weber's absence.  McCauley trained Weber for approximately two weeks.  *See*, Exhibit I of defendant's Appendix, McCauley's deposition, p. 93, ll. 24-25; p. 94, ll. 1-12.

On February 3, 2005, Clift asked McCauley to schedule a meeting with Williamson to find out what his plans were "as far as you and I are concerned?" McCauley agreed stating, "I will, because nothing is happening as he told me it would."  Clift inquired as to what  McCauley had been told and McCauley told her what Williamson had said to her on January 10.  Clift commented that she wasn't told anything like that.  Clift told McCauley that Williamson had told her to leave McCauley alone, that he had her on a special project.  *See*, Exhibit 5 of plaintiffs' Response, McCauley's deposition, p. 60, ll. 20-25, p. 61, ll. 1-24; p. 77, ll. 11-23.

The next day, February 4, 2005, McCauley met with Williamson.  McCauley described the meeting as follows:

> I told him about Patty's visit coming in my office the evening before, and I said she asked that I speak to you.  And he says, I've been putting this off, but we have to do something.  We just can't afford you.  You make $17 an hour.  My fire chief just makes $19.
>
> * * *
>
> And he said, what you need to do is retire.  And I said, I'm not old enough to retire.  He said, you can take early retirement and we'll tell the - - you can save face that way.  We'll tell the newspaper that you're taking early retirement and we'll give you a party and - - and I said, well, first of all, I'm not going to retire until I'm at full retirement age, and second of all, I was born and raised in this town.  People know my

professional qualifications and my personal ethics.  I have nothing to save face about.   So what are the other options?

He said, well, you're not going to like any of them.  And at that point, he offered me a billing clerk job at $6 an hour, or roughly $6 an hour, and he offered to move his secretary, Christina Pendarvis, to another position and give me her job at 8 something an hour.  And I said, no, I'm not interested in either one of those.

\* \* \*

And I said to him, why don't you just terminate me, like you have everyone else.  He said, oh, I'll never fire you.  I'll just eliminate your job as grants administrator.  And I said, you know very well I'm not grants administrator and haven't been for several months now.  He said, but you still are on the records.  And I - - he said, you take the weekend to think this over.  And I said, well, I've got to go take care - - I've got to go find out some information.

*See*, Exhibit 5 of plaintiffs' Response, McCauley's deposition, p. 80, 8-13, 21-25; p. 81, ll. 1-12; Exhibit I of defendant's Appendix, McCauley's deposition, p. 82, ll. 18-25, p. 83, ll. 1-5.

That afternoon, McCauley went to the social security office and set up an appointment for Monday morning.  On Monday of that next week, McCauley signed up for social security benefits.  *See*, Exhibit I of defendant's Appendix, McCauley's deposition; p. 84, ll. 20-21.

Later in the week, Pickens told McCauley that she had gone to Williamson and told him to come up with another offer better than $8 or he was leaving the City wide open for a lawsuit.  Pickens also told McCauley that she had told Williamson to offer McCauley a trainee position at a higher rate of $11.58.  On Friday, February 11, 2005, Pickens, while processing McCauley's termination paperwork, gave a document to McCauley to sign.  The document extended to McCauley two positions, assistant to the finance director at $11.58 per hour and utility billing clerk II at $6.95 per hour,

and stated that McCauley's failure to accept the positions would terminate her employment. McCauley signed the document, declining the offers. When she signed the document, Pickens told McCauley that she could not file any charges against the City. *See*, Exhibit 5 of plaintiffs' Response, McCauley's deposition, p. 103, ll. 15-25; p. 104, l. 1; p. 108, ll. 1-8; p. 109, ll. 12-17, ll. 19-20; Exhibit R of defendant's Appendix.

Defendant's personnel action form dated February 11, 2005 shows the reason for McCauley's termination was "Abolish Grants Administration Position." *See*, Exhibit 6 of plaintiffs' Response. Williamson, however, admitted that the position had already been eliminated. *See*, Exhibit C of defendant's Appendix, Williamson deposition, p. 85, ll. 18-21.

According to Meacham, McCauley demonstrated the ability to understand and perform the responsibilities associated with the accounts payable department. She was willing to learn new ideas and was dedicated to accuracy in her work. *See*, Amended Exhibit No. 7, filed July 7, 2006 (doc. no. 27), Affidavit of Randolph S. Meacham, Jr., ¶ 3.

Discussion

A plaintiff seeking to prove age discrimination may do so by presenting direct evidence of discriminatory motivation, such as oral or written statements by a supervisor reflecting age bias. *See*, Jones v. Unisys Corp., 54 F.3d 624, 630 (10th Cir. 1995), *see also*, Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1225 (10th Cir. 2000). Alternatively, a plaintiff may prove age discrimination with indirect or circumstantial evidence. Jones, 54 F.3d at 630. When indirect or circumstantial evidence is relied upon to prove an age discrimination claim, the court applies the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). *Id*.

> *McDonnell Douglas* first requires the aggrieved employee to establish
> a prima facie case of prohibited employment action.  The burden of
> establishing a prima facie case . . . by a preponderance of the evidence
> is not onerous.  Furthermore, [t]his burden is one of production, not
> persuasion; it can involve no credibility assessment.  If the employee
> makes a prima facie showing, the burden shifts to the defendant
> employer to state a legitimate, nondiscriminatory reason for its adverse
> employment action.  If the employer meets this burden, then summary
> judgment is warranted unless the employee can show there is a genuine
> issue of material fact as to whether the proffered reasons are pretextual.

Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005) (quotations and citations
omitted).

Direct Evidence of Age Discrimination

Plaintiffs assert that they have direct evidence of age discrimination,
specifically, oral statements made by Williamson.  Plaintiffs proffer this evidence
through the affidavits of  Barbara Martin and Jeanette Johnson.  *See*, Exhibit 11 and
Exhibit 12 of plaintiffs' Response.  According to Martin, she  overheard Williamson
say to McCauley, "I've had it fucking up to here with you old ladies whining."
Exhibit 11 to plaintiffs' Response, ¶ 4.  Additionally, Johnson has testified that she
overheard Williamson, during a telephone conversation, say "Karen is too damn old
to be working here and too damn old to be working anywhere for that fact.  They are
both too old, her and Kathy both."  Exhibit 12 to plaintiffs' Response,  ¶ 3.  Johnson
further testified that she overheard Williamson say after an impromptu staff meeting
informing everyone that Thomsen was no longer working for the City,  "well that's
a good thing because she is getting way too old and too forgetful to be working."
*Id.*, ¶ 4.

"Direct evidence is [e]vidence, which if believed, proves [the] existence of [a]
fact in issue without inference or presumption."  Shorter v. ICG Holdings, Inc., 188
F.3d 1204, 1207 (10th Cir. 1999) (quotations omitted), *overruled in part on other*

*grounds by* <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003).  Direct evidence requires "proof of an existing policy which itself constitutes discrimination," <u>Tomsic v. State Farm Mut. Auto. Ins. Co.</u>, 85 F.3d1472, 1477 (10th Cir. 1996) (quotations omitted), or "oral or written statements on the part of a defendant showing a discriminatory motivation," <u>Kendrick.</u>, 220 F.3d at 1225.  Statements expressing a personal opinion, "even when reflecting a personal bias or prejudice, do not constitute direct evidence of discrimination." <u>Shorter</u>, 188 F.3d at 1207.  Instead, by offering such statements, the plaintiff asks the fact-finder to infer, that, because the defendant harbors personal opinions, the defendant acted with discriminatory intent toward the plaintiff. <u>Mitchell v. City of Wichita, Kansas</u>, 140 Fed. Appx. 767, 778 (10th Cir. 2005) (citing <u>Heim v. State of Utah</u>, 8 F.3d 1541, 1546 (10th Cir. 1993)).  Consequently, the court may consider statements reflecting personal opinions only when determining if there is "circumstantial or indirect evidence of discrimination against the plaintiff. <u>Stone v. Autoliv ASP, Inc.</u>, 210 F.3d 1132, 1136 (10th Cir. 2000).

The court concludes that the statements proffered by plaintiffs do not constitute direct evidence of age discrimination.  Although the statements were inappropriate, the court finds that the statements reflects Williamson's personal opinions and are not evidence that the actual motive behind Williamson's decisions to terminate Thomsen and McCauley were discriminatory.  It is only arguable that a discriminatory intent to terminate can be inferred from the statements.   Inferential statements are not direct evidence of discrimination. <u>Heim</u>, 8 F.3d 1546.  There being no direct evidence of age discrimination, the court will apply the <u>McDonnell Douglas</u> framework.

Prima Facie Case

To establish a prima facie case of age discrimination in a reduction-in-force ("RIF") case, a plaintiff must show: (1) the plaintiff was within a protected age group; (2) plaintiff was doing satisfactory work; (3) the plaintiff was discharged despite the

adequacy of his work; and (4) there is some evidence the employer intended to discriminate against her in reaching its RIF decision.  Pippin v. Burlington Resources Oil And Gas Co., 440 F.3d 1186, 1192 (10th Cir. 2006).

In its motion, the City contends that neither of the plaintiffs can show that she was doing satisfactory work.  Specifically, as to Thomsen, the City asserts that she was not satisfactorily performing her duties as city clerk/city treasurer because she was delegating a substantial portion of her duties to other employees.   As to McCauley, the City contends that McCauley was not satisfactorily performing her duties as accounts payable clerk because Weber, upon returning to work, found unprocessed invoices on McCauley's desk, which were seriously past due.

The court concludes that there is evidence in the record from which a jury could conclude that both plaintiffs were satisfactorily performing their duties.  *See*, Exhibit 1 of plaintiffs' Response, Rainey deposition, p. 34, ll. 15-25; p. 37, ll. 23-25; p. 38, ll. 1-25; Exhibit 2 of plaintiffs' Response, Thomsen's deposition, p. 47, ll. 11-23; p. 48, ll. 13-21, p. 50, ll. 5-25, p. 51, ll. 1-25; p. 52, ll. 1-25, p. 53, ll. 1-13; Exhibit 3 of plaintiffs' Response, Response to Interrogatory no. 4; Exhibit 13 of plaintiffs' Response; Exhibit 1 of plaintiffs' Response, Rainey's deposition, p. 41, ll. 21-25, p. 42, ll. 1-8; Amended Exhibit 7 of plaintiffs' Response.  The court concludes that plaintiffs have submitted sufficient evidence to raise a genuine issue of material fact as to the second element of plaintiffs' prima facie case.

The City also contends that McCauley cannot establish the third element of the prima facie case because she voluntarily left her employment.  The court, however, concludes that there is evidence from which a jury could conclude that McCauley did not voluntarily leave her employment.  *See*, Exhibit 5 of plaintiffs' Response, McCauley's deposition, p. 80, 8-13, 21-25; p. 81, ll. 1-12; Exhibit I of defendant's Appendix, McCauley's deposition, p. 82, ll. 18-25, p. 83, ll. 1-5; Exhibit 5 of

plaintiffs' Response, McCauley's deposition, p. 103, ll. 15-25; p. 104, l. 1; p. 108, ll. 1-8; p. 109, ll. 12-17, ll. 19-20; Exhibit R of defendant's Appendix.   The court concludes that McCauley has proffered adequate evidence to raise a genuine issue of material fact as to the third element of her prima facie case.

The City further contends that both plaintiffs cannot show that there is some evidence the employer intended to discriminate against them in reaching its RIF decision.   According to the Tenth Circuit, the fourth element may be established "through circumstantial evidence that plaintiff was treated less favorably than younger employees during the [RIF]."   Pippin, 440 F.3d at 1192-93.   A plaintiff need only "point to circumstances that show the employer could have retained her, but chose instead to retain a younger employee."   Stone, 210 F.3d at 1138 (quotations omitted). The court concludes that there is evidence from which a jury could conclude that plaintiffs could have been retained but that younger employees were retained instead. *See*, Exhibit C of defendant's Appendix, Williamson's deposition, p. 68, ll. 16-23; p. 69, ll. 1- 25; p. 70, ll. 7-9; Exhibit D of defendant's Appendix, Thomsen's deposition, p. 134, ll. 24-25; p. 135, ll. 9–18; p. 138, ll. 6-15; Exhibit 3 of plaintiffs' Response, Interrogatory no. 3 response; Exhibit I of defendant's Appendix, McCauley's deposition, p. 120, ll. 5-16; Exhibit A of defendant's Appendix, Section 20.2; Exhibit C of defendant's Appendix, Williamson's deposition, p. 79, ll. 5-12.

Articulation of  a Non-discriminatory Reason for Termination

Defendant's position is that plaintiffs' separation from employment occurred because of a RIF due to the City's dire fiscal status and the business assessment that each of the plaintiffs was over-compensated for the actual services she provided to the City.   The court finds and plaintiffs do not dispute that defendant has articulated a legitimate, non-discriminatory reason for plaintiffs' termination.

Pretext

All that is necessary for plaintiffs to avoid summary judgment is evidence or inferences which are sufficient to create genuine issues of material fact with regard to the elements of plaintiffs' prima facie case and the issue of pretext. *See*, Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995) (plaintiff can withstand summary judgment if plaintiff succeeds in showing a prima facie case and presents evidence that the defendant's proffered reason for the employment decision was pretextual).

> There are three common methods used to demonstrate pretext in the RIF context: (1) evidence that the termination of the employee is inconsistent with the employer's RIF criteria; (2) evidence that the employer's evaluation was falsified to cause termination; or (3) evidence that the RIF is more generally pretextual. These methods do not foreclose the possibility of others.

Stone, 210 F.3d at 1140 (quotations omitted).  The court finds that the following evidence creates inferences which are sufficient to raise a genuine issue of material fact as to whether defendant's proffered reason for the employment decisions was pretextual.

1.     Rainey's testimony that when he left the position of city manager, the City's finances were "like a different world."

2.     Rainey's testimony that the termination of Thomsen and McCauley would not have fixed the City's financial problems.  *See*, Exhibit 1 of plaintiffs' Response, Rainey deposition, p. 91, ll 18-25, p. 92, ll. 1-23.

3.     Rainey's testimony that Thomsen's compensation was not disproportionate to her duties and that he had given her a merit increase, at the urging of city council, due to her work performance.

4.     Rainey's and Thomsen's testimony that Thomsen did not delegate her duties as city clerk or city treasurer.  *See*, Exhibit 1 of plaintiffs' Response, Rainey deposition, p. 37, ll. 16-25; p. 38, ll. 1-3; Exhibit 2 of plaintiffs' Response, Thomsen's

deposition, p. 47, ll. 11-23; p. 48, ll. 12-21; p. 50, ll. 5-14; p. 51, ll. 1-25; p. 52, ll. 1-25; p. 53, ll. 1-13; Exhibit 3 to plaintiffs' Response, Interrogatory no. 4 response.

5.     Williamson's use of subjective criteria, such as personal observations and experience, to evaluate Thomsen.  *See*, Exhibit 4 to plaintiffs' Response, Williamson deposition, p. 43, ll. 9-15.  The use of subjective criteria is relevant to the issue of pretext.  *See*, Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1218 (10th Cir. 2002).[1]

6.     Williamson would not have considered reducing Thomsen's pay, as opposed to firing her.  *See*, Williamson's deposition, p. 54, ll. 1-25, p. 55, ll. 1-5.

7.     Thomsen's city clerk duties were performed by one employee under the age of 40.  McCauley's account payable clerk duties were also performed by one employee under the age of 40.

8.     Williamson's statements that  "Karen is too damn old to be working here and too damn old to be working anywhere for that fact.  They are both too old, her and Kathy both."  Williamson's statement, after the impromptu staff meeting informing everyone that Thomsen was no longer working for the City, "well that's a good thing because she is getting way too old and too forgetful to be working."  Age-based comments by a plaintiff's supervisor can be relevant evidence of pretext demonstrating that the supervisor had "preconceived notions premised on [the plaintiff's age]" and "ultimately terminated her based at least in part on [his ageist bias]."  Plotke, 405 F.3d at 1107.  The court concludes that plaintiffs have sufficiently shown a nexus between these statements and Williamson's decisions.  *Id.*

---

[1]It should be borne in mind, however, that the use of subjective criteria "is not wrongful per se," Bauer v. Bailar, 647 F.2d 1037, 1046 (10th Cir. 1981) and that, as was discussed in the cited passage from Garrett, the use of subjective criteria will typically amount, at most, to a factor to be considered.  A showing that subjective criteria were used is most potent in the hands of the plaintiff when the criteria upon which the employer relied were *entirely* subjective.  Green v. New Mexico, 420 F.3d 1189, 1195 (10th Cir. 2005) (citing Jones v. Barnhart, 349 F.3d 1260, 1267-68 (10th Cir. 2003)).

9.     McCauley's termination paperwork states that her discharge was due to abolishing the grants administration position.   However, the position had been eliminated by Rainey months before McCauley was terminated and Williamson so admitted.  *See*, Exhibit 6 of plaintiffs' Response;  Exhibit 1 of plaintiffs' Response, Rainey's deposition, p. 41, ll. 1-21; Exhibit C of defendant's Appendix, Williamson deposition, p. 85, ll. 18-21.

10.     Shortly prior to her termination, McCauley was in the position of accounts payable clerk.  That position was not eliminated after McCauley's discharge. *See*, Abuan v. Level 3 Communications, Inc., 353 F.3d 1158, 1169 (10th Cir. 2003) (one way a RIF plaintiff may show pretext is to present evidence that his job was not eliminated but remained "a single, distinct position.")

11.     Although the appeal board had voted not to reinstate Weber to the accounts payable clerk position and the city manager had an opportunity to defend his actions in regard to a termination to the city council, Williamson told the city council that Weber's termination was wrongful and she should be reinstated.

12.     Meacham testified that McCauley demonstrated the ability to understand and perform the responsibilities associated with the accounts payable department and that she was willing to learn new ideas and was dedicated to accuracy in her work.

13.     Mildred Weber, an 83 year old employee, was terminated shortly after McCauley.  Ms. Weber only made a little more than $7.00 an hour.  *See*, Exhibit 9 of plaintiffs' Response.  Evidence not too remote in time that defendant terminated another older employee would be relevant to question of defendant's policies and practices.  Zuniga v. Boeing Co., 133 Fed. Appx. 570, 580 (10th Cir. 2005) (citing Greene v. Safeway Stores, Inc., 98 F.3d, 554, 561 (10th Cir. 1996)).

    With this evidence and the evidence raising genuine issues of material fact as to plaintiffs' prima facie case, the court finds that plaintiffs' claims withstand defendant's motion for summary judgment and that the case must proceed to trial.

<u>Conclusion</u>

    Based upon the foregoing, the court determines that there are genuine issues of material fact which preclude summary judgment in defendant's favor.

    Accordingly, Defendant's Motion for Summary Judgment, filed June 1, 2006 (doc. no. 16), is **DENIED**.

    Dated this 16th day of August, 2006.


                                    STEPHEN P. FRIOT
                                    UNITED STATES DISTRICT JUDGE


05-1196p006(pub).wpd